IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KEITH HICKMAN, | ) | CASE NO. 5:16 CV 1077 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE JEFFREY J. HELMICK |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| MARGARET BRADSHAW, Warden, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |

### INTRODUCTION

Petitioner Keith Hickman, a prisoner in state custody, has filed in this Court a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his conviction and sentence in *State v. Hickman*, Case No. CR-2013-09-2555.  (Doc. No. 1.) Respondent Margaret Bradshaw[1] has filed a return of writ.  (Doc. No. 6.)  Hickman has filed a traverse, to which Respondent has replied.  (Doc. Nos. 7, 8.)  Hickman has filed a further response.  (Doc. No. 9.)

This matter is before the undersigned by an automatic order of reference under Local Rule 72.2 for preparation of a report and recommendation on Hickman's petition or other case-dispositive motions.[2]  For the reasons stated below, the Court recommends Hickman's petition be  DISMISSED.

---

[1] Margaret Bradshaw is the warden of the Richland Correctional Institution, located in Mansfield, Ohio, where Hickman is incarcerated.  (Doc. No. 6 at 1.)

[2] This case was transferred to the undersigned from Magistrate Judge Nancy A. Vecchiarelli upon her retirement.

## FACTUAL BACKGROUND

Ohio's Ninth District Court of Appeals set forth the following facts underlying

Hickman's convictions:

{¶ 8} Tobias Flakes testified as follows. Flakes worked for Hickman doing odd jobs at several of Hickman's properties. Flakes was suffering from a drug problem and Hickman paid him "normally in crack and cash, majority crack." Flakes further testified that Hickman was a drug dealer and he witnessed Hickman sell drugs. Around the beginning of March in 2013, Flakes and his girlfriend began renting a room in Hickman's house in Akron. Driven by his addiction, Flakes stole a gun from Hickman's house and sold the gun for drugs.

{¶ 9} On the evening of March 8, 2013, Hickman arrived at the house with several friends. Flakes and his girlfriend were in the living room. Hickman entered the house and said, "Dude, T, where's my f* * * * * * gun?" Flakes panicked and suggested that the gun might be in the basement. Hickman grabbed Flakes and went to the basement to look for the gun. Once in the basement, Hickman looked at Flakes and said, "Why the f* * * you lying? Where's my gun?" Flakes testified that, at that point, Hickman "exploded." Hickman picked up a broken cement brick and "bashed" Flakes in the head. Flakes again insisted that he did not have the gun. Hickman then grabbed Flakes under his arms and walked him up the stairs and out of the basement. Hickman took Flakes into the kitchen and pinned him in a corner. After reaching into his own pockets, Hickman called for his friends to "bring that gun in here." Hickman dragged Flakes into the living room and directed Flakes' girlfriend to open the front door. When she refused, Hickman pulled Flakes over to the door and opened it himself. Two men were standing outside and one of them handed Hickman a gun. Flakes was in tears as he pleaded, "Keith, please. I don't want to die." Hickman placed the gun up against Flakes' leg and again said, "Where['s] the f* * * * * * gun at?" Hickman then shot Flakes in his left leg. Flakes testified that the men said they needed to "go dump him somewhere." As the men escorted Flakes out of the house and down the steps, Flakes yelled for his girlfriend to leave and find help. Flakes' girlfriend then called 911 on her cell phone. Hickman and the two men then decided to abscond, leaving Flakes behind on the steps. Flakes testified that the men went back into the house briefly before driving away.

{¶ 10} When the paramedics arrived, Flakes told them he did not know who shot him. During his testimony, Flakes explained that he and Hickman had previously discussed "the G code," an understanding whereby drug dealers do not turn to law enforcement to settle their disputes. Flakes testified that he lied to the paramedics because it had been imparted on him that "snitches belong in ditches." Flakes and his girlfriend had been working as confidential informants for the police. Flakes explained that by coming forward to testify, he had violated the code. Flakes also

2

testified that his girlfriend was subpoenaed but he would not let her appear in court because he did not want her to go against the code. With respect to injuries, Flakes had numerous surgeries and was placed in a medically induced coma but doctors were eventually able to save his life.

*State v. Hickman*, No. 27321, 2015 WL 7075274, at *2 (Ohio Ct. App. Nov. 12, 2015).

These facts "shall be presumed to be correct," and Hickman has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 360-61 (6th Cir. 1998).

## PROCEDURAL BACKGROUND

### A.    Trial Court

On September 30, 2013, the Summit County Grand Jury indicted Hickman on one count of felonious assault in violation of Ohio Rev. Code § 2903.11(A)(1)/(2) with an attached firearm specification.  (Doc. No. 6-1, Exh. 1.)  Hickman entered a plea of not guilty to the charge.  (Doc. No. 6-1, Exh. 2.)

The case proceeded to a jury trial on February 26, 2014.  (Doc. No. 6-1, Exh. 4.)  On March 3, 2014, the jury found Hickman guilty of felonious assault and the firearm specification.  (Doc. No. 6-1, Exh. 4.)  On March 14, 2014, the trial court conducted a sentencing hearing and sentenced Hickman to eight years' imprisonment for the felonious-assault charge and three years' imprisonment for the firearm specification, to be served consecutively, for a total sentence of eleven years in prison.  (Doc. No. 6-1, Exh. 5.)

### B.    Direct Appeal

Hickman, through new counsel, filed a timely notice of appeal to the Ninth District Court of Appeals.  (Doc. No. 6-1, Exh. 6.)  In his appellate brief, he raised the following assignments of error:

1.    The trial court abused its discretion when it denied the Appellant's motion for a mistrial based on the fact that juror misconduct occurred, which adversely affected the Appellant's right to a fair trial in violation of his 5th, 6th, and 14th Amendment rights under the U.S. Constitution and Article 1, Section 10 of the Ohio Constitution.

2.    Appellant's conviction of felonious assault was contrary to the manifest weight of the evidence, and the jury lost its way when it found the Appellant guilty.

3.    The trial court erred as a matter of law because the State failed to establish on the record that there was sufficient evidence to support a conviction of felonious assault.

4.    The trial court committed plain error when it failed to control the witness as he continued to add commentary and insult the defense rising to a level of misconduct and prejudice that should have warranted a mistrial.

5.    The prosecutor's remarks about the Appellant rose to the level of prosecutorial misconduct, which deprived the Appellant of his right to a fair trial in violation of his 5th, 6th, and 14th Amendment rights under the U.S. Constitution and Article 1, Section 10 of the Ohio Constitution.

6.    The trial court erred and abused its discretion in imposing Appellant's sentence.

7.    The trial court abused its discretion when it failed to replace the juror who performed outside research with the alternate juror to ensure a fair trial for Appellant.

8.    The trial court committed plain error when it failed to provide curative statements to the jury to combat the prejudicial effects of a witness and that prosecution, which deprived the Appellant of a fair trial.

9.    The cumulative effect of all the errors enumerated in assignments of errors 1, 4, 5, 7 and 8 denied the Appellant the right to a fair trial and due process under the Sixth and Fourteenth Amendments to the United States

4

Constitution, R.C. 2901.04 and Article 1[,] Section 10 of the Ohio Constitution.

(Doc. No. 6-1, Exh. 7 (capitalization altered).)  The State filed a brief in response.  (Doc. No. 6-1, Exh. 8.)

On November 12, 2015, the Ohio appellate court affirmed the trial court's judgment. (Doc. No. 6-1, Exh. 9.)

Hickman, acting *pro se*, filed a timely notice of appeal of the appellate court's judgment to the Ohio Supreme Court.  (Doc. No. 6-1, Exh. 10.)  In his memorandum in support of jurisdiction, he set forth the following propositions of law:

1.  When a juror conducts an independent investigation of the accused and the trial court does not grant a mistrial or remove the juror, the accused is denied his right to a fair trial in violation of the Fifth, Sixth and Fourteenth Amendment[s] to the United States Constitution.

2.  When a trial court fails to control a witness of counsel a defendant is denied his Sixth Amendment right to a fair and impartial trial by jury[.]

3.  When appellate counsel failes [*sic*] to raise a claim of trial counsel ineffectiveness that is clear on the face of the record, Hickman is denied his right to the effective assistance of appellate counsel under the Sixth Amendment to the United States Constitution[.]

(Doc. No. 6-1, Exh. 11 (capitalization altered).)

The Ohio Supreme Court declined jurisdiction over the appeal on March 9, 2016.  (Doc. No. 6-1, Exh. 12.)

**FEDERAL HABEAS CORPUS**

5

Hickman filed the *pro se* petition for writ of habeas corpus now before this Court on May 4, 2016.  (Doc. No. 1.)  The petition asserts the following three grounds for relief:

1.  Petitioner was denied his right to a fair trial in violation of the Fifth, Sixth and Fourteenth Amendment[s] to the United States Constitution when a juror conducted an independent investigation of the accused and the trial court did not grant a mistrial or remove the juror.

2.  Petition was denied his Sixth Amendment right to a fair and impartial trial by jury when the trial court failed to control the State's key witness[.]

3.  Hickman is denied his right to the effective assistance of appellate counsel under the Sixth Amendment to the United States Constitution when appellate counsel failes [*sic*] to raise a claim of trial counsel ineffectiveness that is clear on the face of the record.

(Doc. No. 1 at 6, 7, 8 (capitalization altered).)

On July 22, 2016, Respondent filed a return of writ.  (Doc. No. 6.)  On August 5, 2016, Hickman filed a traverse.  (Doc. No. 7.)  On August 18, 2016, Respondent filed a sur-reply to the traverse.  (Doc. No. 8.)  Hickman responded to the sur-reply on August 26, 2016.  (Doc. No. 9.)

### STANDARDS OF REVIEW

#### A.     AEDPA Review

Hickman's petition for writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), as it was filed after the Act's 1996 effective date. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Murphy v. Ohio*, 551 F.3d 485, 493 (6th Cir. 2009).  AEDPA, which amended 28 U.S.C. § 2254, was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)).  The Act "recognizes a foundational principle of our federal system:  State courts are adequate forums for the

6

vindication of federal rights." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).  It therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.*

One of AEDPA's most significant limitations on district courts' authority to grant writs of habeas corpus is found in § 2254(d).  That provision forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis original).  A state court has adjudicated a claim "on the merits," and AEDPA deference applies, regardless of whether the state court provided little or no reasoning at all for its decision.  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

"Clearly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).  It includes "only the holdings, as opposed to the dicta, of [Supreme Court] decisions." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted).  The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that

7

the result and reasoning are consistent with Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). And a state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state-court decision is contrary to "clearly established Federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). And "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003). The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 134 S. Ct. at 15; *see also Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual determinations, which only can be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Supreme Court has cautioned, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt*, 134 S. Ct. at 15 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court

8

adjudications of federal claims.  The Court has admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under de novo review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Harrington*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold.").  Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal."  *Harrington*, 562 U.S. at 102-03 (internal quotation marks omitted).  Thus, a petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*. at 103.  This is a very high standard, which the Court readily acknowledges: "If this standard is difficult to meet, that is because it is meant to be."  *Id.* at 102.

      **B.**    **Exhaustion and Procedural Default**

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus.  28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982).  This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims."

*Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982).  It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is a related but "distinct" concept from exhaustion.  *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  Procedural default occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by state courts because he failed to:  (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available.  *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806.  In determining procedural default, the federal court again looks to the last explained state-court judgment.  *Ylst*, 501 U.S. at 805; *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000).

Where a state court declines to address a prisoner's federal claims because the prisoner has failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds.  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law.  *Id.* at 732-33.  To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied.  *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).

A petitioner also may procedurally default a claim by failing to raise the claim in state court, and pursue the claim through the state's "ordinary appellate review procedures," if, at the

time of the federal habeas petition, state law no longer allows the petitioner to raise the claim. *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition.").  Under these circumstances, while the exhaustion requirement is technically satisfied because there are no longer any state-court remedies available to the petitioner, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review.  *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review."); *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . ., it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law' . . . ." (internal citations omitted)).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis.  *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)).  Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue - not merely as an issue arising under state law.'"  *Id*. (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered.  *Coleman*, 501 U.S. at 750.

11

"'[C]ause' under the cause and prejudice test must be something external to the petitioner,
something that cannot be fairly attributed to him." *Id*. "[T]he existence of cause for a procedural
default must ordinarily turn on whether the prisoner can show that some objective factor external
to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id*. "A
fundamental miscarriage of justice results from the conviction of one who is 'actually
innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*,
477 U.S. 478, 496 (1986)).

### C. Cognizability

To the extent that claims asserted in federal habeas petitions allege state-law violations,
they are not cognizable on federal habeas review and should be dismissed on that basis. "It is
not the province of a federal habeas court to reexamine state-court determinations on state-law
questions. In conducting habeas review, a federal court is limited to deciding whether a
conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*,
502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780
(1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac*, 456
U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a
denial of due process.") (citation omitted)).

Moreover, "a state court's interpretation of state law, including one announced on direct
appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v.
Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68). A federal habeas court does
not function as an additional state appellate court reviewing state courts' decisions on state law
or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

12

State-court rulings on issues of state law may, however, "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  But they must be "so egregious that [they] result in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  Fundamental fairness under the Due Process Clause is compromised where "the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' . . . and which define 'the community's sense of fair play and decency.'" *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal citations omitted). Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Id*. (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

## ANALYSIS

### A.      First Ground for Relief:  *Juror Misconduct*

For his first ground for relief, Hickman argues the trial court erred by denying his motion for mistrial based on juror misconduct.  (Doc. No. 1-2 at 8-10.)  Specifically, a juror conducted independent research and informed the other jurors of his findings.  (Doc. No. 1-2 at 9-10.) Respondent contends this claim lacks merit.  (Doc. No. 6 at 24-29.)

The state appellate court on direct appeal was the last state court to address this issue, reasoning:

> {¶ 30} In his first assignment of error, Hickman argues that the trial court abused its discretion when it denied appellant's motion for a mistrial based on the actions of a juror. Hickman asserts that the jury was contaminated when Juror No. 2 performed outside research and shared his findings with the jury. This Court disagrees.

13

{¶ 31} A trial court enjoys broad discretion in dealing with matters of juror misconduct. *State v. Morris*, 9th Dist. Summit No. 25519, 2011 Ohio 6594, ¶ 29, citing *State v. Herring*, 94 Ohio St.3d 246, 259, 762 N.E.2d 940 (2002). Thus, an appellate court reviews the trial court's denial of a motion for mistrial based on juror misconduct for an abuse of discretion. *State v. Thomas*, 9th Dist. Summit No. 26893, 2014 Ohio 2920, ¶ 32, citing *Morris* at ¶ 29. Under this standard, "[a] trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by evidence, or grossly unsound." *Menke v. Menke*, 9th Dist. Summit No. 27330, 2015 Ohio 2507, ¶ 8, quoting *Tretola v. Tretola*, 3d Dist. Logan No. 8 1414, 2015 Ohio 1999, ¶ 25.

{¶ 32} "When analyzing a case of alleged juror misconduct, it must be determined (1) whether misconduct actually occurred and (2) whether the misconduct materially prejudiced the defendant's substantial rights." *Morris* at ¶ 28, citing *State v. Herb*, 167 Ohio App.3d 333, 855 N.E.2d 115, 2006 Ohio 2412, ¶ 6 (9th Dist.). Thus, even when juror misconduct has, in fact, occurred, a complaining party must establish prejudice. *State v. Adams*, 103 Ohio St.3d 508, 817 N.E.2d 29, 2004 Ohio 5845, ¶ 42, citing *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The Supreme Court of Ohio has maintained a "long-standing rule * * * not [to] reverse a judgment because of the misconduct of a juror unless prejudice * * * is shown ." *Adams* at ¶ 45, quoting *State v. Hipkins,* 69 Ohio St.2d 80, 83, 430 N.E.2d 943 (1982); *Thomas* at ¶ 33.

{¶ 33} Furthermore, "[a] juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court." *Thomas* at ¶ 34, quoting *State v. Schmitz,* 9th Dist. Lorain Nos. 11CA010043, 11CA010044, 2012 Ohio 2979, ¶ 15. "One may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest [person] to live up to the sanctity of his [or her] oath is well qualified to say whether he [or she] has an unbiased mind in a certain matter." *State v. Gunnell*, 132 Ohio St.3d 442, 973 N.E.2d 243, 2012 Ohio 3236, ¶ 30, quoting *Phillips,* 455 U.S. at 217, fn. 7. While a trial court's determination with respect to juror bias is entitled to great deference under circumstances where a juror reads outside or forbidden material, we note that the trial court's inquiry of the juror is vital in making its determination. *Gunnell* at ¶ 32 34, 973 N.E.2d 243.

{¶ 34} Just after the parties signed the verdict forms in this case, Juror No. 2 wrote the trial court a note stating, "Juror No. 2, [ ] looked up names on the Summit County Clerk of courts website for name spelling purposes. Looked up name of defendant. Thought it was Whitman."

{¶ 35} Upon receiving the note, the trial court decided to question the juror in chambers in the presence of counsel. The trial court asked Juror No. 2 to explain the note. Juror No. 2 responded, "Curiosity. The name for some reason escaped me. It

14

was like was it Hickman, Whitman, and I just felt like I should just know the name. And I thought if I just put that in, Whitman, on the Summit County Clerk of Courts, not on Google, just to see what the name was between the two." The website search occurred during the early stages of the trial, after the jury had been impaneled. When questioned about the scope of his inquiry, Juror No. 2 stated, "I typed in Whitman, and Whitman came up with not what I thought it was. And then Hickman. And then just next to it, it just said the charge, and that's all the further I went with it. * * * I didn't click on it or anything like that." When asked why he felt compelled to write the note, Juror No. 2 explained that he mentioned his search to his fellow jurors after they reached a verdict and signed the paperwork. At that point, the foreman then urged Juror No. 2 to notify the court. In addition to stating that the information on the clerk's website did not impact his decision, Juror No. 2 insisted that he did not share any information with the jurors that was not presented in court.

{¶ 36} After questioning Juror No. 2, the trial court stated on the record that it did not appear that his search was prejudicial. Defense counsel asked to have Juror No. 2 replaced with the alternate juror or, in the alternative, to pursue additional questioning to ensure that he was telling the truth. At that point, the trial court agreed to question the jury foreman. The foreman stated that Juror No. 2 did not mention the website search until after the jury had reached a verdict. The foreman further stated that Juror No 2 did not make any substantive comments about the case, other than to note that Flakes' girlfriend had been subpoenaed to testify. In response to a question from the prosecutor, the foreman stated that he was not aware that Juror No. 2's website search played any role in the verdict itself.

{¶ 37} The trial court indicated that it wanted to question Juror No. 2 again regarding the statement about the subpoena for Flakes' girlfriend. Both attorneys agreed that further questioning was warranted. The trial court again brought Juror No 2 into chambers and asked him whether he made a comment about the subpoena. Juror No. 2 said he expressed an opinion about the subpoena but his opinion was not based on any information from outside of court. On two separate occasions, the trial court asked if he clicked on the case link on the clerk's website, and Juror No. 2 responded in the negative on both occasions. At that point, the trial court excused Juror No 2. and called the foreman back into chambers. The trial court asked the or evidence that was provided to the court. The foreman initially responded that Juror No. 2 said he was "online and he found stuff." When pressed on the issue, the foreman said he was not certain because he was using the restroom at the time and walked into the room in the middle of the conversation. The trial court continued to probe into the issue. The foreman stated, "[Juror No. 2] said he was looking up stuff on the website and he saw Mr. Hickman's name. I believe he said he saw a subpoena for [Flakes' girlfriend]. It was easy to find. And that's all he said. He didn't discuss any of the contents * * *[.]"

15

{¶ 38} At that point, defense counsel moved for a mistrial. Before ruling on the motion, the trial court voir dired each juror to determine the impact of any statements made by Juror No. 2. The jurors were uniform in saying that any statements made by Juror No. 2 did not influence deliberations. There was some disagreement about when the statements were made with two jurors saying the statements were made before deliberations concluded and another juror saying he could not recall the statements at all. Significantly, however, all of the jurors insisted that any outside research performed by Juror No. 2 did not impact their decision in the case. After speaking with each juror, the trial court denied the motion for a mistrial.

{¶ 39} The trial court did not abuse its discretion in denying Hickman's motion for a mistrial. "The trial judge is in the best position to determine the nature of the alleged jury misconduct and the appropriate remedies for a demonstrated misconduct." *State v. Wharton*, 9th Dist. Summit No. 23300, 2007 Ohio 1817, ¶ 25. The trial court in this case sought to safeguard the fairness of the trial by engaging in a deliberate inquiry to determine the extent of the misconduct and the effect that it may have had on the jury. In addition to questioning Juror No. 2 and the jury foreman on multiple occasions, the trial court engaged in an independent examination of each juror. Though Hickman asserts there is "no way to know for certain" whether Juror No. 2's statements influenced deliberations, we note that Hickman was required to establish that he was prejudiced by the misconduct. *Adams* at ¶ 45. Here, each juror, including Juror No. 2, was adamant that the website search had no impact on their decision in the case. Under these circumstances, we cannot say that the trial court's denial of the motion was unreasonable, lacking in evidentiary support, or grossly unsound.

*Hickman*, 2015 WL 7075274, at *7-9.

The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." U.S. Const. amend. VI.  Indeed, the right to a trial by an impartial jury "lies at the very heart of due process." *Smith v. Phillips*, 455 U.S. 209, 224 (1982).  Due process requires "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id*. at 217.  And "time and time again, in a broad variety of contexts, the [Supreme] Court has adopted strong measures to protect the right to trial by an impartial jury." *Id*. at 225.

16

In *Remmer v. United States*, 347 U.S. 227 (1954), a federal criminal tax evasion case, the Supreme Court observed that "[t]he integrity of jury proceedings must not be jeopardized by unauthorized invasions." *Id*. at 229. Once a jury in a criminal case is empaneled, therefore, "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . ." *Id*. The Court noted in *Remmer* that this presumption is not conclusive, however; the government bears the burden of showing that the contact with the juror was harmless to the defendant. *Id*. Accordingly, when informed of any improper communication with a juror, the trial court "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id*. at 229-30.

The Supreme Court modified the *Remmer* rule in the habeas case *Smith v. Phillips*, placing the burden on the defendant to show actual prejudice from *ex parte* juror communications. *Smith,* 455 U.S. at 215 ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."). *See also Sheppard v. Bagley*, 657 F.3d 338, 348-49 (6th Cir. 2011) (Batchelder, J., concurring) ("*Remmer* was abrogated in part by the Supreme Court in *Smith v. Phillips*, which held that the defendant has the burden to show that there has been *actual* prejudice."). The Court in *Smith* explained, "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. . . . [I]t is virtually impossible to shield jurors from every contact or

17

influence that might theoretically affect their vote." *Smith,* 455 U.S. at 217.  The Court also noted that state-court findings are presumptively correct in habeas actions.  *Id*. at 218.

Hickman asserts the state appellate court unreasonably applied this precedent in rejecting his claim.  (Doc. No. 1-2 at 10.)  He argues that *Remmer* controls here, and the state court misapplied the standards set forth in that case for instances of juror misconduct by shifting the burden of proving prejudice to the defense.  (Doc. No. 1-2 at 10; Doc. No. 7 at 12.)  As explained above, however, the Supreme Court altered the *Remmer* rule in *Smith v. Phillips* by making it the defendant's rather than the State's burden to show actual prejudice from a juror's misconduct.  *Smith,* 455 U.S. at 215.

Hickman also challenges the state appellate court's conclusion that Juror No. 2's research did not prejudice him.  (Doc. No. 1-2 at 10.)  He claims other jurors made statements that "question" whether Juror No. 2 was honest about his intentions in researching Hickman's name. He cites as support a statement of one of the jurors that Juror No. 2 "just said he was on there, he found a name.  I think he noted   mentioned a subpoena as well for Donna Henry."  (Doc. No. 1-2 at 10.)  But evidence of the juror's intent is not relevant to prejudice, and even if it were, the statement does not demonstrate that Juror No. 2's actions harmed Hickman in any respect.

The state appellate court reasonably determined that the trial court, after conducting "a deliberate inquiry," did not err in denying Hickman's motion for a mistrial based on the juror's misconduct when "each juror, including Juror No. 2, was adamant that the website search had no impact on their decision in the case." *Hickman*, 2015 WL 7075274, at *9.  The Court finds, therefore, that the state court's decision was not contrary to, or an unreasonable application of,

18

Supreme Court precedent, and recommends that Hickman's first ground for relief be dismissed.

**B.      Second Ground for Relief:  *Trial-Court Error / Evidentiary Ruling***

Hickman argues in his second ground for relief that the trial court's "failure to control" Tobias Flakes, the victim and State's key witness, during his testimony on cross-examination deprived Hickman of a fair trial.  (Doc. No. 1-2 at 10-13.)  Hickman acknowledges the trial court "repeatedly reprimanded" Flakes for making unsolicited, objectionable comments and refusing to answer questions.  (Doc. No. 1-2 at 11.)  But, he maintains, the court still permitted Flakes to avoid testifying and "portray defense counsel in a negative manner."  (Doc. No. 1-2 at 11, 13.)  Respondent contends this claim is not cognizable on federal habeas review.  (Doc. No. 6 at 8-11.)    The last state court to address this claim was the court of appeals on direct review, which stated:

> {¶ 19} In his fourth assignment of error, Hickman contends that the trial court committed plain error when it did not declare a mistrial in light of the victim's testimony. Hickman contends that Flakes' commentary on the record created a negative impression of Hickman, as well as defense counsel, thereby prejudicing the defendant and undermining the integrity of the trial. This Court disagrees.

> {¶ 20} After Flakes identified Hickman as the shooter on direct examination, defense counsel employed several tactics on cross-examination aimed at undermining Flakes' credibility. Defense counsel asked probing questions centering on Flakes' lifestyle, drug addiction, and memory, in addition to several questions about the extent of Flakes' injuries. The exchange grew antagonistic on several occasions and the trial court repeatedly admonished both Flakes and defense counsel. At one point, the trial court sustained an objection when defense counsel asked Flakes if he was "already a crackhead" when he met Hickman. A short time later, after Flakes made unsolicited comments about how difficult it was for him confront Hickman, defense counsel asked Flakes if he used crack cocaine before he came to the courthouse. Flakes answered in the negative and took exception to the question. Later, Flakes made an uninvited remark that he had trouble pronouncing defense counsel's name because it sounded like a disease. On another occasion, when Flakes' answer exceeded the scope of a question, defense counsel stated, "You need to shut up [.]" The trial court

directed both defense counsel and Flakes to be quiet, but not before Flakes responded, "You don't tell a grown man to shut up." The trial court then threatened to hold both the witness and the attorney in contempt. Subsequently, when the trial court sustained an objection to a question on re-cross examination, Flakes remarked, "This is ridiculous. They['re] giving law licenses out." The trial court rebuked Flakes, and he apologized. Shortly thereafter, when the trial court sustained yet another objection to a question by defense counsel, Flakes exclaimed, "So you didn't smoke crack this morning?" The trial court directed the jury to disregard the comment, and defense counsel then indicated he had no further questions. After dismissing the jury for a lunchtime recess, the trial court held Flakes in contempt for the question he directed toward defense counsel.

{¶ 21} There are no exact standards to apply in evaluating whether a trial court should declare a mistrial in a particular case. *State v. Plant*, 9th Dist. Wayne No. 2599, 1991 WL 81650 (May 15, 1991). "Instead, the law grants great deference to the trial court's discretion in this area, in recognition of the fact that the trial judge is in the best position to determine whether the situation in his courtroom warrants the declaration of a mistrial." *Id*. "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991); *State v. Mercer*, 9th Dist. Summit No. 26361, 2013 Ohio 1527, ¶ 7.

{¶ 22} Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To constitute plain error, the error must be obvious and have a substantial adverse impact on both the integrity of, and the public's confidence in, the judicial proceedings. *State v. Tichon*, 102 Ohio App.3d 758, 767, 658 N.E.2d 16 (9th Dist.1995). A reviewing court must take notice of plain error only with the utmost caution, and only then to prevent a manifest miscarriage of justice. *State v. Bray*, 9th Dist. Lorain No. 03CA008241, 2004 Ohio 1067, ¶ 12. This Court may not reverse the judgment of the trial court on the basis of plain error, unless appellant has established that the outcome of the trial clearly would have been different but for the alleged error. *State v. Kobelka*, 9th Dist. Lorain No. 01CA007808, 2001 WL 1379440 (Nov. 7, 2001), *2, citing *State v. Waddell*, 75 Ohio St.3d 163, 166, 661 N.E.2d 1043 (1996).

{¶ 23} In this case, the trial court did not commit plain error by failing to sua sponte declare a mistrial. Flakes was the State's key witness in this case and defense counsel pursued an aggressive line of questioning in hopes of attacking Flakes' credibility. The fact that Flakes struggled to answer certain questions and became exceedingly emotive during his testimony was not prejudicial to Hickman, and, in fact, seemed to suggest that defense counsel succeeded in calling into question the reliability of the State's most important witness. Furthermore, though Flakes made a number of unbridled comments during his testimony, the trial court consistently intervened and

20

directed Flakes to wait for a question and to refrain from making argumentative statements. Thus, Hickman has not "established that the outcome of trial cleansed of the objectionable statement[s] would have been different or that the trial court's failure to order a mistrial was a manifest miscarriage of justice." *State v. Jones*, 9th Dist. Summit No. 18690, 1998 WL 318483, *1 (June 17, 1998). Accordingly, the fourth assignment of error is overruled.

*Hickman*, 2015 WL 7075274, at *4-5.

Hickman cites no Supreme Court precedent establishing a federal constitutional claim based on a state trial court's "failure to control" a witness.  And, as Respondent argues, it is well-settled that merely invoking the phrases "fair trial" or "due process" does not raise a federal constitutional claim.  *See Slaughter v. Parker,* 450 F.3d 224, 226 (6th Cir. 2006) ("While a petitioner need not cite 'chapter and verse' of constitutional law, 'general allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present claims' that specific constitutional rights were violated.'") (quoting *Blackmon v. Booker*, 394 F.3d 399, 400 (6th Cir. 2004) (internal citations omitted)).

If Hickman alleges here, as he did in state court, that the trial court erred by failing to *sua sponte* declare a mistrial, that is an error of state law and is not cognizable on federal habeas review.  *See, e.g., Kyle v. Gansheimer*, No. 5:11 CV 1395, 2013 WL 6330900, at *19 (N.D. Ohio Dec. 4, 2013) (Gaughan, J.) (finding petitioner "asserts an error of state law, i.e., failure to *sua sponte* declare a mistrial, and . . . such a claim is not cognizable in federal habeas corpus").  As the state court noted, such claims are reviewed for abuse of discretion, which is not a federal constitutional violation.  *See, e.g., Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001) ( "[A] state trial court's alleged abuse of discretion, without more, is not a constitutional violation.").

 Nor has Hickman alleged a violation of federal constitutional law if he is suggesting the trial court erred by failing to restrain Flakes' objectionable commentary and uncooperative,

21

disruptive behavior through evidentiary rulings. Generally, "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review." *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012); *see also Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001) (noting that federal habeas courts "do not pass upon 'errors in the application of state law, especially rulings regarding the admission or exclusion of evidence.'" (quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988)). Federal habeas courts presume that state courts correctly interpret state evidentiary law in their evidentiary rulings. *Small v. Brigano*, No. 04-3328, 2005 WL 1432898, at *5 (6th Cir. June 17, 2005.)

Nevertheless, as explained above, state-court rulings on issues of state law may "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). As Hickman concedes, the trial court repeatedly intervened during defense counsel's cross-examination of Flakes, admonishing Flakes to stop making objectionable statements, directing him to wait for and answer questions, and eventually finding Flakes in contempt for one of his derogatory comments toward defense counsel. Moreover, as the state court reasonably concluded, Flakes' behavior during the cross-examination strongly suggested that defense counsel was successful in casting doubt on Flakes' credibility. The trial court's actions with regard to Flakes, therefore, did not render Hickman's trial fundamentally unfair.

Accordingly, the Court finds that Hickman's second ground for relief does not state a cognizable claim for federal habeas relief, and recommends that it be dismissed.

### C. Third Ground for Relief: *Ineffective Assistance of Appellate Counsel*

22

For his third ground for relief, Hickman claims his appellate counsel provided ineffective assistance by failing to raise a claim of ineffective assistance of trial counsel based on counsel's failure to object to testimony that violated the Confrontation Clause.  (Doc. No. 1-2 at 13-16.) Hickman raised this claim on direct appeal to the Ohio Supreme Court, which summarily declined jurisdiction.  (*See* Doc. No. 6-1, Exhs. 11 at 117-20 and; Doc. No. 6-1, Exh. 12.)

### 1.    Procedural Posture

Respondent asserts this claim is unexhausted, because Hickman has not raised it in an application to reopen his direct appeal pursuant to Ohio Appellate Rule 26(B) but still may do so through a delayed reopening application.  (Doc. No. 6 at 18-20.)  Rule 26(B) governs Ohio's "separate collateral opportunity" to raise appellate counsel ineffective-assistance claims. *Goldberg v. Maloney*, 692 F.3d 534, 537 (6th Cir. 2012).  It requires that applications be made within ninety days from journalization of the appellate judgment, but allows delayed applications upon a showing of good cause.  Ohio R. App. P. 26(B)(1).  Respondent cites *Goldberg v. Maloney*, *supra*, in which the Sixth Circuit held that "raising a claim for ineffective assistance of appellate counsel in a discretionary appeal to the Ohio Supreme Court, without addressing the claim through Ohio Appellate Rule 26(B), does not satisfy the exhaustion requirement unless the Ohio Supreme Court addresses the issue on the merits."  *Goldberg*, 692 F.3d at 538.  The court explained, "although a defendant *may* raise the ineffective assistance of counsel issue in both a timely direct appeal and a timely application under Rule 26(B), the Ohio Supreme Court's denial of the discretionary appeal does not exhaust the issue because the court of appeals is nevertheless obliged to address the application on the merits."  *Id*. (emphasis original).  Respondent notes that

23

in this case, the Ohio Supreme Court did not adjudicate Hickman's appellate counsel ineffective-assistance claim on the merits; it summarily declined jurisdiction over his direct appeal.

Hickman responds that *Goldberg* is not controlling precedent here, because the Sixth Circuit held in an earlier case, *Thompson v. Warden, Belmont Corr. Inst.*, 598 F.3d 281, 285 (6th Cir. 2010), that appellate counsel ineffective-assistance claims are fairly presented to Ohio courts for purposes of federal habeas review through a discretionary appeal to the Ohio Supreme Court. *See Salmi v. Sec'y of Health and Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) ("A panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.").

District courts in Ohio do not agree on whether *Goldberg* or *Thompson* controls on this issue.  *Compare Perry v. Warden of Mansfield Corr. Inst.*, 2015 WL 2097815, at *19 (N.D. Ohio May 5, 2015) (White, M.J.) (citing both cases and stating that "[a] number of United States district court decisions in Ohio have declined to enforce procedural default where a petitioner did not raise or timely raise an ineffective assistance of counsel claim in a Rule 26(B) application but nonetheless raised such claims on direct appeal before the Ohio Supreme Court"), *with Fletcher v. Bradshaw*, No. 3:16 CV 945, 2015 WL 3130242, at *2 (N.D. Ohio July 24, 2017) (Carr, J.) (finding *Goldberg* rather than *Thompson* applied to issue of whether petitioner exhausted  appellate counsel ineffective-assistance claim by raising it in a motion for leave for appeal to the Ohio Supreme Court, because "in *Thompson*, unlike in *Goldberg* and the present case, the respondent waived the petitioner's procedural default defense. Further, . . . the court in *Thompson* did not address the availability for the petitioner to move to reopen his appeal via

24

Ohio App. R. 26(B), *res judicata*, or *State v. Davis*, 119 Ohio St.3d 422, 2008-Ohio-4608, 894 N.E.2d 1221 (holding that a pending appeal claiming ineffective assistance of appellate counsel does not deprive the appellate court of jurisdiction regarding a Rule 26(B) application and that the Supreme Court's declination to hear a case is not a decision on the merits with res judicata effect)).

The Court, therefore, declines to decide whether Hickman exhausted his appellate counsel ineffective-assistance claim by presenting it to the Ohio Supreme Court on discretionary review as this claim can easily be resolved on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (courts may skip complicated "procedural-bar issues" if the merits are "easily resolvable against the habeas petitioner"); *see also* 28 U.S.C. § 2254(b)(2) (courts may deny unexhausted habeas petitions on the merits).

### 2.    Merits

Hickman argues his appellate counsel was ineffective for failing to raise a claim of ineffective assistance of trial counsel.  Respondent does not address the merits of this claim.  As this ground for relief was not adjudicated on the merits in state courts, the Court reviews it *de novo*.  *See, e.g., Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011) ("Claims that were not 'adjudicated on the merits in State court proceedings' receive the pre-AEDPA standard of review: *de novo* for questions of law (including mixed questions of law and fact), and clear error for questions of fact.").

 The Supreme Court has long recognized that the Sixth Amendment right to the effective assistance of counsel at trial "is a bedrock principle in our justice system."  *Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012).  *See also Gideon v. Wainwright*, 372 U.S. 335, 342-44 (1963).

25

The Supreme Court announced a two-prong test for habeas claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687. To determine if counsel's performance was "deficient" pursuant to *Strickland*, a reviewing court must find that the representation fell "below an objective standard of reasonableness." *Id.* at 688. It must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." *Id*. at 689.

Second, the petitioner must show that he or she was prejudiced by counsel's errors. To do this, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id*. at 693 (citation omitted). Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

The Court in *Strickland* instructed reviewing courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks and citations omitted). Indeed, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690.

The Supreme Court further has held that a defendant is entitled to effective assistance of counsel in his first appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). The

26

two-part test enunciated in *Strickland* is applicable to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  An appellant has no constitutional right, however, to have every non-frivolous issue raised on appeal, *Jones v. Barnes*, 463 U.S. 745, 750-54 (1983), and tactical choices regarding issues to raise on appeal are properly left to the sound professional judgment of counsel, *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).  "[O]nly when issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (internal quotation marks and citations omitted).

Hickman's appellate counsel ineffective-assistance claim is based on trial counsel's failure to object to the following testimony that he alleges violated the Confrontation Clause:

1. Flakes testified, "Donna's outside screaming, banging on the outside of the house trying to get attention."  (Doc. No. 6-2 at 133.)

2. Flakes testified that he told Donna to leave the house "[b]ecause I didn't want her to learn anything as a witness" and "because I was scared she was going to lose her life, too."  (Doc. No. 6-2 at 136.)

3. Detective Garro testified that he knew Donna Henry called 911"[b]ecause after I listened to all the tapes and then in the months afterwards having various conversations with Donna Henry, one, I recognized her voice, and two, I confronted her about this and she admitted to calling."  (Doc. No. 6-2 at 363.)

(Doc. No. 1-2 at 15.)

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  In *Crawford v. Washington*, 541 U.S. 36, 59 (2004), the Supreme Court held that "this provision bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'"

27

*Davis v. Washington*, 547U.S. 813, 821 (2006) (quoting *Crawford*, 541 U.S. at 53  54).  The Court declined to give a precise definition of "testimonial," but stated that "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68.

More recently, the Court explained that "a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial." *Ohio v. Clark*,    U.S.   , 135 S. Ct. 2173, 2180 (2015).  Under this "primary purpose" test, "the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Id*. (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)).  "'Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.'" *Id*. (quoting *Bryant*, 562 U.S. at 359).  Moreover, the Confrontation Clause does not bar the introduction of out-of-court statements that would be admissible under general rules of criminal hearsay law.  *Id*.

In applying the "primary purpose" test, the Supreme Court has found a shooting victim's dying declaration to police was not testimonial under *Crawford* because "the conversation was primarily aimed at quelling an ongoing emergency, not establishing evidence for the prosecution." *Id*. (citing *Bryant*, 562 U.S. 344).  It also has noted that the "questioner's identity" is "highly relevant," and "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Id*. at 2182.  The Court, therefore, has found statements of a three-year-old to his preschool teacher, *id*. at 2182-83, and of a four-year-old to her babysitter and mother, *White v. Illinois*, 502 U.S. 346 (1992), to be non-testimonial.

28

Hickman asserts that because Flakes was the only witness at trial to identify Hickman as the shooter, "any testimony from any witness [who] spoke to the whereabouts, actions taken, or statements made by Donna Henry, were offered . . . to corroborate [Flakes'] highly questionable testimony . . .[, and] *any* inference of corroboration coming from [Henry,] a non-testifying witness[,] runs afoul of the holding in *Crawford*."  (Doc. No. 1-2 at 15 (emphasis original).)  But the Confrontation Clause's reach is far more limited.  As explained above, the provision bars only statements a non-testifying, but available, witness made during a conversation intended to "obtain[] testimonial evidence against the accused."  *Clark*, 135 S. Ct. at 2180.

The first two statements Hickman challenges here clearly did not violate Hickman's rights under the Confrontation Clause.  As to Flakes' testimony that Henry was "screaming" and "banging" on the house after the shooting, even assuming this conduct can be considered a "statement" or assertion of some kind, it was not testimonial.  Henry's screaming and banging clearly was not elicited during any kind of interrogation, questioning or conversation "aimed at gathering evidence for a prosecution."  *Clark*, 135 S. Ct. at 2183.  And the Confrontation Clause does not apply to the second challenged statement, Flakes' testimony about what *he* said *to* Henry, because Flakes obviously was not a non-testifying witness who could not be cross-examined.  As these statements did not violate the Confrontation Clause, Hickman's counsel was not ineffective for failing to object to them.

The third statement Hickman claims violated the Confrontation Clause    Detective Garro's testimony that Henry admitted she made the anonymous 911 call when he "confronted" her about it    is closer to the kind of testimonial statement described in *Crawford*.  Henry made the remark to a law enforcement officer during an interrogation for the purpose of establishing

evidence for a prosecution.  However, even if this testimony violated the Confrontation Clause by recounting a testimonial statement, Hickman's counsel was not ineffective for failing to object to it.

Defense counsel's failure to object to the testimony at issue did not prejudice Hickman. The Sixth Circuit has observed:

> Because of the "numerous potentially objectionable events" that occur throughout trial, we have previously noted that "any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice."

*Hodge v. Haeberlin*, 579 F.3d 627, 648 (6th Cir. 2009) (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006)).  Far from "essentially default[ing]" Hickman's case, the detective's testimony about Henry's admission regarding the 911 call had little if any impact on Hickman's defense.  First, the detective had another basis for believing Henry made the call.  Defense counsel asked the detective a series of questions about the call on cross-examination, beginning with, "How did you know that Donna Henry called?"  (Doc. No. 6-2 at 363.)  The detective answered that his primary reason was that, after "various conversations" with her, he recognized her voice; and only secondly that she admitted it to him.  (Doc. No. 6-2 at 363.)  Second, defense counsel still was able to attack the detective's conclusion and efforts to verify his belief that Henry made the call.  He asked him, "Now, in your years of experience, when a loved one gets shot, is it ususal for the person that's calling regarding their loved one not to identify themselves?"  (Doc. No. 6-2 at 364.)  And he confirmed though his questioning that the detective had not reviewed Henry's cell phone records to prove she made the 911 call and he did not know

30

her before his investigation.  (Doc. No. 6-2 at 372-74.)  Finally, and most significantly, Hickman does not demonstrate that the fact that Henry made a 911 call was critical to the State's case.  It may corroborate a particular detail of Flakes' version of the events surrounding the shooting, but only a minor detail of that story.  In fact, the prosecutor did not even mention Henry's 911 call in his closing argument.  (*See* Doc. No. 6-2 at 407-21; 437-42.)  Therefore, even if Detective Garro's testimony that Henry admitted to making a 911 call did violate the Confrontation Clause, Hickman was not prejudiced by counsel's failure to object to it, and counsel did not provide ineffective assistance.  *See Lundgren*, 440 F.3d at 770 (noting that if a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail).

The Court finds, therefore, that Hickman's counsel was not ineffective for failing to object to the testimony Hickman challenges under the Confrontation Clause.  It follows, then, that Hickman's claim of ineffective assistance of appellate counsel based on counsel's failure to raise these trial counsel ineffective-assistance claims also is meritless.  Accordingly, the Court recommends that Hickman's third ground for relief be denied.

CONCLUSION AND RECOMMENDATION

For the reasons stated above, the Court recommends that Petitioner Keith Hickman's

petition for writ of habeas corpus (Doc. No. 1) be DISMISSED in its entirety, because the claims

raised are non-cognizable and/or meritless.


Date:   November 30, 2017                    *s/ Jonathan Greenberg*_____
                                             Jonathan D. Greenberg
                                             United States Magistrate Judge



**OBJECTIONS**
        **Any objections to this Report and Recommendation must be filed with the Clerk of
Court within fourteen (14) days after the party objecting has been served with a copy of
this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within
the specified time may waive the right to appeal the District Court's order.  *See United
States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g
denied*, 474 U.S. 1111 (1986).**